Submitted December 17, 2021, affirmed May 18, petition for review denied September 16, 2022 (370 Or 214)

JOSEPH M. LANKFORD,
*Petitioner-Appellant,*

*v.*

Brad CAIN,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
12119769P; A172913

510 P3d 938

After drinking heavily and ingesting diazepam, petitioner shot and killed T. For that conduct, a jury found petitioner guilty of murder. Petitioner sought post-conviction relief on the ground that his trial lawyers rendered inadequate and ineffective assistance, in violation of his rights under the state and federal constitutions, by (1) not having the blood sample that was taken from him on the night of the shooting tested for the presence of diazepam; and (2) not objecting to his shackling during his trial. The post-conviction court rejected those contentions and denied relief. Petitioner appealed. *Held*: The Court of Appeals determined that the trial lawyers' failure to have the blood sample tested for diazepam could not have tended to have affected either the trial court's voluntariness ruling or the jury's assessment of whether defendant intentionally shot the victim. As for shackling, there is no evidence that the restraints were visible to the jury or that petitioner was otherwise prejudiced by them.

Affirmed.

J. Burdette Pratt, Senior Judge.

Jedediah Peterson and O'Connor Weber LLC filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General and Erin K. Galli, Assistant Attorney General, filed the brief for respondent.

Before Mooney, Presiding Judge, and Lagesen, Chief Judge, and DeVore, Senior Judge.

LAGESEN, C. J.

Affirmed.

**LAGESEN, C. J.**

After drinking heavily and ingesting diazepam, petitioner shot and killed T, to whom he was married. For that conduct, a jury found petitioner guilty of murder. Petitioner seeks post-conviction relief on the ground that his trial lawyers rendered inadequate and ineffective assistance, in violation of his rights under the state and federal constitutions, by (1) not having the blood sample taken from him on the night of the shooting tested for the presence of diazepam; and (2) not objecting to his shackling during his trial. The post-conviction court rejected those contentions and denied relief. Accepting the post-conviction court's supported implicit and explicit factual findings and reviewing for legal error, *Green v. Franke*, 357 Or 301, 312, 350 P3d 188 (2015), we affirm.

We state the facts in accordance with our standard of review. Petitioner shot and killed T. He was intoxicated at the time. He came home angry at T after a family reunion and started firing shots in their bedroom.

After hearing the first shot, T's daughter, J, looked into the room to find out what was going on. T, who was sitting at a desk in front of a computer, told her not to worry because petitioner was just shooting blanks.

About 10 minutes after hearing the first shot, J heard a second shot. She again looked into the room. J saw her mother sitting in the same position with petitioner standing next to her and pointing a gun at her. Petitioner yelled at J to leave the room, and she complied.

A short time later, J heard a third shot. She looked into the room and saw her mother slumped over the desk with blood coming out of her head. J called for her brother, who was also in the house.

Petitioner told J's brother that the shot had ricocheted off the window and hit T's head. Petitioner called 9-1-1 to report the shooting, repeating his story about the window.

Law enforcement arrived and took petitioner into custody. Petitioner was *Mirandized* and, before he was taken to jail, interviewed by Deputy Sheriff Slater of the

Coos County Sheriff's Office. That interview was recorded. Petitioner explained that he was angry at T and upset about the noise from the computer, so he shot at the computer screen and missed. He then shot at the screen a second time, but he again missed, and the shot bounced off the window and hit T.

A blood sample was taken from petitioner at the scene. While the blood draw was being taken, petitioner estimated that his blood alcohol content (BAC) would be about .17. Testing later revealed that his BAC was .187. The blood sample was not tested for the presence of drugs before petitioner's trial, although petitioner had told the officers that he "takes medicine every night and took diazepam," but was not sure if he had taken it before the shooting.

Before trial, defendant moved to suppress the statements that he made during his interview on the night of the offense. His theory was that his intoxication rendered his waiver of his *Miranda* rights involuntary. After listening to the recordings of petitioner's 9-1-1 call and Slater's interview of petitioner, the trial court rejected that contention, finding that the recordings demonstrated that petitioner was composed and able to communicate.

At trial, the state's theory was that petitioner had the conscious objective to kill T, notwithstanding his high level of intoxication. In support of that theory, the prosecutor pointed to evidence that petitioner was angry at T, that he had fired a total of three shots in the manner described by J, that the 9-1-1 call and petitioner's interview with Slater demonstrated that, notwithstanding his intoxication, petitioner was coherent and responsive to questions around the time of the shooting, and that the forensic analysis of the crime scene indicated that T had been shot in the head at intermediate range, with the gun within 12 inches of her head. The prosecutor also argued that petitioner's version of events—that he was aiming at the computer screen—did not track with the evidence of how the bullet entered T's head.

Petitioner's defense was that he did not have the intent to kill the victim. Although the defense did not claim that petitioner was so intoxicated that he could not have

formed the conscious intent to kill, it did claim that petitioner's intoxication had made him act recklessly with disregard for the value of human life, something that made him culpable for manslaughter but not murder.

In support of that defense, petitioner presented expert testimony from Dr. Robert Julien. Julien testified that fragmentary blackouts occur at blood alcohol levels of .25 and above. He testified that "at about a .30, you begin to develop total blackouts." Julien testified that, based on the blood test results and extrapolation, petitioner's BAC would have been about .22 at the time of the shooting, something that would put him in a "confusional state." Julien opined that petitioner would not be high functioning at that blood alcohol level and, for example, should not be driving cars or handling firearms. He also noted that someone with petitioner's blood alcohol level would not be deemed capable of consenting to surgery.

Noting the possibility that petitioner also had consumed diazepam, Julien testified that if petitioner had consumed diazepam, then it would have increased petitioner's intoxication. On cross-examination, the prosecutor elicited from Julien that there was no evidence that petitioner had consumed diazepam, to which Julien added that, for reasons he did not understand, petitioner's blood had not been tested.

Throughout the trial, petitioner wore a leg brace; his trial lawyers did not object to the restraints. The jury found petitioner guilty of murder. Petitioner's subsequent appeal was dismissed on petitioner's own motion.

Petitioner then initiated this post-conviction proceeding. In connection with this proceeding, he had the blood sample submitted for a toxicology test. The test revealed the presence of diazepam and a related metabolite. In view of that, petitioner alleged that trial counsel was inadequate and ineffective for not having his blood sample tested for diazepam. This, petitioner alleged, prejudiced him in two distinct ways. First, he argued that it could have tended to show that his intoxication rendered his *Miranda* waiver invalid, something that could have affected the trial court's

decision on his motion to suppress. Second, he argued that it could have affected the jury's verdict at trial.

In support of those claims, petitioner submitted an affidavit from Julien. In it, Julien explained how the new toxicology results would have affected his testimony at trial. Based on those results, he would have testified that petitioner had consumed a "therapeutic dose" of diazepam on the night of the shooting and that, as a result, petitioner's "level of intoxication *** was well above the equivalent of a [BAC] of .25." Julien did not opine that, as a result of the diazepam, petitioner's blood alcohol level would have precluded petitioner from forming intent. He also did not opine that petitioner's BAC was at .30 or above, the level at which, according to Julien's trial testimony, would have resulted in petitioner experiencing a complete blackout that would, in Julien's view, preclude the formation of intent.

In addition to his claim about the drug testing, petitioner alleged that trial counsel also was inadequate and ineffective for not objecting to the shackling during trial.

The post-conviction court denied relief. Although it concluded that petitioner's trial lawyers performed deficiently by not having petitioner's blood tested for diazepam, it ruled that their omission did not prejudice petitioner. It also denied relief on the shackling claim. Petitioner appeals.

On appeal, petitioner assigns error to the denial of relief on his claims relating to his trial lawyers' failure to have the blood tested. He contends that the post-conviction court was incorrect to conclude that their omission did not prejudice him. He also assigns error to the denial of relief on the shackling claim.

*Blood test.* On appeal, defendant, the superintendent of the Snake River Correctional Institution, has not cross-assigned as error the post-conviction court's determination that petitioner's trial lawyers performed deficiently by not having his blood tested for diazepam. As a result, the only issue before us is whether the post-conviction court correctly concluded that the failure to test the blood did not prejudice petitioner, either by affecting the ruling on the motion to suppress or the jury's verdict.

For purposes of Article I, section 11, of the Oregon Constitution, a petitioner is prejudiced by an act or omission by trial counsel if that act or omission tended to affect the result of the prosecution. *Johnson v. Premo*, 361 Or 688, 710-11, 399 P3d 431 (2017). Where, as here, the alleged omission involves a failure to investigate, the prejudice determination entails "a sequential inquiry" into whether "'there was more than a mere possibility' that an adequate investigation would have yielded information" that could have been used at defendant's criminal trial in a way that "gave rise to 'more than a mere possibility' that the outcome of the proceeding could have been different as a result." *Monfore v. Persson*, 296 Or App 625, 636, 439 P3d 519 (2019) (quoting *Richardson v. Belleque*, 362 Or 236, 266-68, 406 P3d 1074 (2017) (internal quotation marks omitted)). As the Supreme Court has explained, "Specifically, in a 'failure to investigate' case, a petitioner must show that there is 'more than a mere possibility' that competent counsel 'could have used' the information that counsel failed to uncover * * * in a way that 'could have tended to affect' the outcome of the trial." *Farmer v. Premo*, 363 Or 679, 700-01, 427 P3d 170 (2018) (quoting *Richardson*, 362 Or at 266 (internal quotation marks omitted)). A similar standard governs the determination of prejudice under the Sixth and Fourteenth Amendments to the United States Constitution. *Green*, 357 Or at 311; *Davis v. Kelly*, 303 Or App 253, 261-62, 461 P3d 1043, *rev den*, 366 Or 826 (2020).

In this instance, the record does not allow for the conclusion that, had petitioner's trial lawyers had petitioner's blood tested for diazepam, they could have used the information in a way that could have tended to affect the ruling on the motion to suppress or the jury's verdict.

As for the motion to suppress, the trial court's conclusion that petitioner was not too intoxicated to voluntarily waive his *Miranda* rights hinged largely on the recorded 9-1-1 call and recorded interview with petitioner, which persuaded the trial court that petitioner was not so intoxicated that he could not voluntarily waive his rights. That petitioner's intoxication subsequently was determined to be based in part on diazepam does not call into question that direct evidence of his condition and, for that reason, could not have

tended to have affected the trial court's voluntariness ruling. *State v. Lloyd*, 22 Or App 254, 270-71, 538 P2d 1278 (1975) (intoxication alone does not mean that a defendant cannot understand *Miranda* rights and cannot be bound by waiver of them).

As for its potential to affect the jury's verdict, when considered in the context of the evidence and arguments that were presented to the jury, the omitted evidence could not have tended to affect the jury's assessment of whether defendant intentionally shot T.

First, the omitted evidence could not have supported an alternative defense theory that defendant was so impaired that he lacked the capacity to form intent. Based on the new evidence, Julien opined that petitioner's BAC was "well above" .25. Notably, Julien did not opine that a blood alcohol level of that level would preclude the formation of intent. In addition, Julien's trial testimony was that a .30 BAC was the level at which he believed a person could not form intent, and nothing in the affidavit suggests that Julien thought that, as a result of the diazepam, petitioner's blood alcohol level, although "well above" .25, was at or above .30. Said another way, the omitted evidence does not allow for the conclusion that, had petitioner's lawyers obtained the toxicology testing before trial, they could have presented an entirely different defense theory: that petitioner was too intoxicated to form intent. Julien's new testimony based on the toxicology results does not support such a theory.

Second, the omitted evidence could not have tended to alter the jury's assessment of the defense that petitioner did present. The jury was informed of the possibility that petitioner had consumed diazepam and informed that petitioner's BAC would have, in effect, been higher than the .22 to which Julien testified if petitioner had consumed diazepam. The prosecutor acknowledged in closing that petitioner may have been under the influence of diazepam in addition to alcohol and did not seriously dispute that possibility. Instead, the prosecutor urged the jury to focus on the extensive evidence indicating that petitioner intentionally shot T, none of which hinged on the presence or absence of diazepam in T's blood, and none of which is called into question

by the fact that T had ingested diazepam. Under those circumstances, there is little likelihood that the addition of evidence confirming that petitioner had, in fact, ingested his usual dose of diazepam the night of the incident could have caused the jury to doubt the evidence tending to show that petitioner intentionally shot T in the head.

Opposing this conclusion, petitioner argues that, even without a formal opinion that his consumption of diazepam made his level of intoxication such that he could not form the intent to kill T, that is something that could be inferred by the factfinder based on the omitted evidence. That, petitioner asserts, could have made a difference either in the trial court's ruling on the motion to suppress or in the jury's verdict. But, on this record, it is only merely possible that the omitted evidence could have affected either the trial court's ruling on the motion to suppress or the jury's verdict, given that (1) the trial court and the jury knew that petitioner had a high BAC; (2) the trial court and the jury had contemporaneous evidence of petitioner's condition which demonstrated that, notwithstanding his intoxication, he remained composed and able to communicate intelligently; and (3) the omitted evidence does not allow for a nonspeculative inference that petitioner was functioning in a blackout state. The mere possibility that the omitted evidence might have caused the jury to view the effect of petitioner's intoxication on his ability to waive his *Miranda* rights differently, or caused the jury to view the effect of his intoxication on his ability to act intentionally differently, is insufficient to establish prejudice under either the state or federal constitution. *Davis*, 303 Or App at 274.

For those reasons, the post-conviction court correctly concluded that petitioner did not demonstrate that he was prejudiced for purposes of Article I, section 11, by the failure to have the blood tested for diazepam. For the same reason, the court also correctly concluded that petitioner had not demonstrated prejudice for purposes of the Sixth Amendment.

*Shackling.* Petitioner also assigns error to the post-conviction court's denial of relief on his claim that trial counsel was inadequate and ineffective for not objecting to the use

of leg restraints on him during trial. As petitioner acknowledges, though, there is no evidence that the restraints were visible to the jury or that petitioner was otherwise prejudiced by the restraints. This means that, under our controlling case law, the post-conviction court correctly denied relief. *Larsen v. Nooth*, 292 Or App 524, 425 P3d 484 (2018), *rev den*, 364 Or 749 (2019); *Sproule v. Coursey*, 276 Or App 417, 367 P3d 946, *rev den*, 359 Or 777 (2016).

Affirmed.