354 March 5, 2025 No. 176

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

JANUARY IRENE NEATHERLIN,
*Petitioner-Appellant,*

*v.*

Nichole BROWN,
Superintendent,
Coffee Creek Correctional Institution,
*Defendant-Respondent.*

Washington County Circuit Court
20CV26506; A180759

Patricia A. Sullivan, Senior Judge.

Argued and submitted December 4, 2024.

Margaret Huntington argued the cause for appellant. Also on the opening brief was O'Connor Weber LLC. Also on the reply brief was Equal Justice Law.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Mooney, Senior Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

Petitioner appeals a judgment denying post-conviction relief. In her sole assignment of error, she argues that her counsel provided inadequate and ineffective assistance, specifically by failing to obtain a psychological evaluation to use as mitigation evidence at sentencing, and that the post-conviction court erred in concluding otherwise. Accepting the court's findings of historical fact if supported by the record, and reviewing for legal error, *Green v. Franke*, 357 Or 301, 312, 350 P3d 188 (2015), we affirm.

Under Article I, section 11, of the Oregon Constitution, a petitioner claiming inadequate assistance of counsel must prove by a preponderance of the evidence (1) that trial counsel failed to exercise reasonable professional skill and judgment, and (2) that petitioner suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). Similarly, under the Sixth Amendment, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and that it caused petitioner prejudice. *Strickland v. Washington*, 466 US 668, 687-88, 691, 104 S Ct 2052, 80 L Ed 2d 647 (1984). The state and federal standards are "functionally equivalent." *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014).

In 2017, petitioner was charged with 122 counts of first-degree criminal mistreatment and reckless endangerment in connection with her operation of a home daycare from 2013 to 2017. Petitioner initially had a license, but it was suspended in 2014 after a child exhibited signs of a severe head injury. Petitioner kept operating the daycare without a license. She used a false name, displayed a fake license in that name in her home, and falsely claimed to be a registered nurse. She regularly left the children unattended for hours at a time, while she went to the gym or to the tanning salon, giving them melatonin before she left. There was also evidence that she was physically and verbally abusive. On the day of her arrest, the police found seven unattended infants and young children in petitioner's home, including a six-month-old baby lying on a foam couch covered in his own vomit and a child in a closet in a pack-and-play crib with a

mattress over the top. The children were groggy and unresponsive, and some had elevated melatonin levels.

Petitioner ultimately pleaded guilty to 11 counts of first-degree criminal mistreatment and one count of first-degree assault. The settlement agreement provided for open sentencing, except that petitioner stipulated to a 30-month sentence on the assault charge. At sentencing, the state argued for all consecutive sentences, with a resulting 35-year prison sentence, emphasizing the egregious nature of petitioner's crimes and her prior criminal history. Numerous parents and grandparents of the child victims testified to the substantial effect of petitioner's crimes on the children and their families and urged imposition of the maximum sentence. Petitioner argued for mostly concurrent sentences, with a resulting 50-month prison sentence, emphasizing her remorse and her willingness to take responsibility by pleading guilty.

The trial court sentenced petitioner to 256 months in prison, explaining at length how it reached its decision. It emphasized the massive impact of petitioner's conduct on the children and their families and the "sheer serendipity" that none of the children had died; stated that petitioner had taken "a step" towards taking responsibility but had "a very long way to go"; "wholly reject[ed]" petitioner's innocent explanation for the 2014 head injury; noted petitioner's repeated pattern of deception and putting children at risk; described petitioner's prior criminal history as showing "a pattern of deception, a pattern of lies," and "a complete inability" so far to learn from her criminal decisions; and acknowledged "something broken and something missing" in petitioner that the court hoped could someday be made whole. The court stated that the sentence reflected its balancing of many factors, including the seriousness of the offenses, the number of victims, its belief in petitioner's rehabilitative potential (based on general experience, not anything petitioner had said or done), petitioner's age, and petitioner's motherhood.

We affirmed petitioner's sentence on direct appeal. *State v. Neatherlin*, 302 Or App 381, 457 P3d 378, *rev den*, 366 Or 552 (2020). Petitioner then sought post-conviction relief, claiming, as relevant here, that her counsel provided

inadequate and ineffective assistance by "fail[ing] to obtain, develop, and present mitigating information—including a psychological evaluation and psychological testimony—at sentencing." She put into evidence a psychological evaluation that she had since obtained, which we describe in some detail later. The superintendent put into evidence a declaration from petitioner's trial counsel, in which counsel stated, among other things, that she had considered it unlikely that a psychological evaluation would be useful in mitigation, that petitioner did not seem remorseful for her crimes, and that there was "no evaluation in the world that was going to justify and mitigate what she had done." Counsel's strategy was instead to present petitioner as remorseful, which she felt was ultimately successful.

The post-conviction court denied post-conviction relief, deciding against petitioner on both the performance and prejudice prongs of her claim:

> "In Petitioner's case, the evaluation does not contain compelling information that would mitigate her actions. The harm in Petitioner's case was egregious, involving multiple victims who were babies and toddlers. The sentencing involved a lengthy presentation of Petitioner's history as a child-care provider, a detailed factual background of the crimes she committed and heartrending statements from the victim's families documenting the extensive and terrible impact of Petitioner's crimes. In Petitioner's case, the Court did not impose the maximum sentence but rather imposed consecutive sentences for each of the separate victim[s] for a term to reach a sentence the Court felt appropriate under the circumstances. There is nothing in the mental health evaluation that would indicate the sentence is inappropriate or that the Court would do anything differently particularly in light of the sentencing record."

We need not address the performance prong because, even assuming *arguendo* that counsel's performance was deficient under the particular circumstances, we affirm on the prejudice prong.

To prove prejudice in this context, petitioner had to show "more than a mere possibility, but less than a probability that, had trial counsel properly investigated potential mitigating evidence, the sentence would have been different."

*Maxfield v. Cain*, 322 Or App 405, 409, 520 P3d 890 (2022) (internal quotation marks omitted). Given the sentencing court's discretion in imposing consecutive sentences, to determine whether such a showing was made, we, like the post-conviction court before us, "balance the mitigating evidence, including the new evidence petitioner contends that counsel should have investigated, against the aggravating evidence, and evaluate its impact on the sentencing court's discretion." *Id*. at 414.

In *Maxfield*, for example, we concluded that the petitioner was prejudiced by his counsel's deficient investigation and development of mitigation evidence for sentencing, where a post-conviction psychological evaluation showed that the petitioner had in-utero drug exposure, serious drug use beginning in elementary school, and a very difficult childhood, which resulted in "neurological difficulties" and made it harder for him to regulate his behavior. *Id*. at 414-15. Competent counsel could have used that information to argue diminished mental capacity, a recognized mitigating factor under OAR 213-008-0002(1)(a)(C); to argue that the petitioner was less culpable than someone better able to regulate their behavior; and to contextualize his problems in the juvenile system, an aggravating fact that the state emphasized at sentencing. *Id*. at 415-16; *see also id.* at 416 ("Th[e] unpresented mitigation information, combined with petitioner's youth and relatively minimal criminal history up until his month-long spree of robberies, when weighed against the aggravating circumstances in this case—petitioner's five armed robberies where nobody was ultimately physically injured and petitioner's poor record in the juvenile system—creates more than a mere possibility that counsel's deficient performance affected the outcome.").

Here, the sentencing court made a discretionary decision to impose a mix of consecutive and partially consecutive sentences, so the ultimate question is whether there is "more than a mere possibility that an objective, reasonable factfinder would have chosen to exercise its discretion" to impose a shorter sentence had it been provided with a psychological report like that in the post-conviction record. *Id*. at 413 (internal quotation marks omitted).

The only mitigating evidence presented at sentencing was petitioner's expressed remorse and willingness to take responsibility by pleading guilty. The post-conviction psychological evaluation contains the following additional information that petitioner views as mitigating. Petitioner suffered abuse, neglect, and poverty during her childhood, including abandonment by her mother at age 10. Petitioner began abusing drugs at age 13, was sober for two years after receiving treatment in prison around 2011, and relapsed in 2013 when her brother died. Her substance use was increasing until her 2017 arrest. Based on testing, petitioner has mostly low-average cognitive skills. The evaluator diagnosed her with attention deficit hyperactivity disorder, borderline personality disorder, moderate chronic post-traumatic stress disorder, unspecified bipolar disorder, and polysubstance use disorder in full remission in a restricted environment.

Regarding the period from 2013 to 2017 in particular, when the crimes at issue occurred, the evaluator opined:

"[I]n 2013, when her brother was killed, she was struggling with employment as a felon, and she experienced financial difficulties[;] she fell back into her addictions and eventually could not keep her life together. Because of her previous conviction, as a felon, she had fewer options than other people for work to support her son and niece whom she was raising. Even though she experienced little positive parenting herself, she decided to become a caregiver for other children to support her family. As her anxiety and bipolar symptoms increased, she obsessively used frequent visits to the gym and tanning salon to help with emotional coping in addition to self-medicating with alcohol, marijuana, and drugs. Her obsessive-compulsive tendencies compelled her to follow her self-care schedule even though there was no coverage for her young charges. Due to her own trauma history and trust issues, she preferred to leave the children sleeping unattended rather than risk the abuse she experienced in the hands of other adults. She used Melatonin with the children because she used it herself and with her own children and considered it a safe medication. Although these were unconventional and illegal choices, they made sense to [her] at the time."

We next consider aggravating evidence. Aggravating evidence considered at sentencing included the egregious

nature of petitioner's conduct, the substantial effect of her crimes on the young child victims and their families, and prior criminal history. The post-conviction psychological evaluation adds that petitioner is "distractible, impulsive, forgetful, has weak social skills and vocabulary, and does not always see how her actions will affect her life and those around her"; that she is unlikely to be able to stabilize her mental health enough to maintain long-term full-time employment; that the stresses of daily life are too much for her intellectual and emotional coping skills; and that she "will require many years of significant mental health and community support to build a healthy lifestyle out in the community that is stable."

Petitioner argues that competent counsel could have used the psychological evaluation to make her expressions of remorse at sentencing more credible, to argue that she is less culpable because it is harder for her to regulate her behavior, and to argue that she is personally capable of being rehabilitated. We are unpersuaded. The evaluation is entirely silent on the issue of remorse—either the capacity for it or the fact of it. While petitioner's obsessive-compulsiveness could help explain some of her behavior, it is unlikely that a sentencing court would view it as reducing her culpability for years of criminal conduct that put many children at serious risk on a daily basis. As for petitioner's personal capacity for rehabilitation, nothing in the evaluation suggests any personal rehabilitative capacity greater than what the sentencing court already assumed. Petitioner points to her two years of sobriety, but those two years of sobriety were followed by four years of increasing substance use. Moreover, the evaluator did not link those two years of sobriety to any rehabilitative capacity.

In the end, even assuming that competent counsel would have obtained a psychological evaluation before sentencing in these circumstances, we agree with the post-conviction court that petitioner did not establish prejudice from not having one. Petitioner's sentence—which is nearly 14 years shorter than the state requested—already reflects judicial consideration of petitioner's expressed remorse, an assumption that petitioner has some capacity for

rehabilitation, and recognition that there was "something broken and something missing" in petitioner's psyche. On this record, there is, at best, nothing more than a "mere possibility" that, with the additional information in a psychological evaluation, an objective, reasonable factfinder would impose a lesser total sentence than petitioner received. *Maxfield*, 322 Or App at 409; *see also, e.g.*, *Strickland*, 466 US at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."). The post-conviction court did not err in denying relief.

Affirmed.